UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| JOSEPH S.,[1]<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>KILOLO KIJAKAZI, et al.,<br><br>　　　　　Defendants. | Case No. 23-cv-06401-RMI<br><br>**ORDER RESOLVING SOCIAL SECURITY APPEAL**<br><br>Re: Dkt. Nos. 11, 14 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision finding that Plaintiff was not disabled under Title XVI of the Social Security Act. *See* Admin. Rec. at 1.[2] The Appeals Council of the Social Security Administration declined to review the ALJ's decision. *Id.* As such, the ALJ's decision is a "final decision" of the Commissioner of Social Security, appropriately reviewable by this court. *See* 42 U.S.C. § 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (Dkts. 6, 7), and both parties have filed briefs (Dkts. 11, 14). For the reasons stated below, the decision of the ALJ is REVERSED and the case is REMANDED FOR FURTHER PROCEEDINGS consistent with this order.

**I.     Background**

Because of the extensive record in this matter, the court will discuss only those portions of Plaintiff's medical history relevant to its decision.

Plaintiff has complained of fatigue and sleep difficulties to various medical providers since

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR"), which is independently paginated, has been filed in eight attachments to Docket Entry #10. *See* Dkts. 10-1 through 10-9.

2019. AR at 1133–72 (Plaintiff endorsed frequent "[t]rouble falling or staying asleep, or sleeping too much" and "[f]eeling tired or having little energy" between October 2019 and January 2020). In May of 2020, Plaintiff declined to perform exercises at a physical therapy appointment due to his "poor energy level—something that is currently predominating most aspects of his life and a major area of concern for him." *Id.* at 1493. He told his physical therapist that he planned "to do some more blood work and a CT scan to try to figure out why his energy is so depleted." *Id.*

Plaintiff had a sleep medicine consultation in October of 2020. AR at 505. He reported "progressively nonrestorative sleep for about the last year" and that he "can be prone to sedentary type sleepiness and daytime fatigue. He will take naps in the afternoon for 30 to upwards of 60 minutes to offset secondary sleepiness." *Id.* All of this, Plaintiff reported, affected his "concentration skills and alertness." *Id.* After a polysomnogram, Plaintiff was diagnosed with obstructive sleep apnea. *Id.* at 1614. The polysomnogram also revealed a "[s]leep onset REM period." *Id.* Because of the sleep-onset REM, Plaintiff's doctor expressed "concern that there may be an underlying element suggestive of possible narcolepsy[.]" *Id.* at 972. Evaluators recommended that "[i]f hypersomnia and/or excessive daytime sleepiness are persistent symptoms," Plaintiff should undergo further testing "to evaluate for the presence of a primary hypersomnia." *Id.*

By early 2021, Plaintiff was "using and benefitting from CPAP" for his sleep apnea. AR at 433. Although Plaintiff stated that he felt more rested after starting CPAP, he reported that one day, "after nearly 9 hours of sleep with CPAP in place he was still quite somnolent during the day and took a 2-hour nap in the morning hours." *Id.* To Plaintiff's doctor, this indicated narcolepsy. *Id.* at 435. Tests in March 2021 indicated "the possibility of a central hypersomnia," but were "nondiagnostic for narcolepsy" because Plaintiff did not enter REM during the test. *Id.* at 1577. Plaintiff was advised to repeat the test in the future because he suffered from a headache during testing which might have affected the results. *Id.*

In April 2021, Plaintiff's doctor observed that Plaintiff "still has persistent daytime somnolence in spite of optimal CPAP use[.]" AR at 351. The doctor believed that Plaintiff likely suffered from narcolepsy (despite the inconclusive test), excessive daytime sleepiness, and "[p]ossible idiopathic hypersomnia as well." *Id.* at 349. Plaintiff reported that "he has to get most

2

of his work done in the early part of the day because by the time the afternoon comes around he has a compelling need to sleep due to the hypersomnia." *Id.* The next month, a nurse practitioner assessed Plaintiff with chronic fatigue, speculating that it could be caused by long COVID, narcolepsy, or an autoimmune condition. *Id.* at 1099. Plaintiff told the nurse practitioner that he took medication for fatigue, but that it was not working and he was suffering from side effects. *Id.* at 1100.

In the summer of 2021, blood tests revealed Plaintiff had elevated levels of estrogen. AR at 1069. While an early blood test noted that Plaintiff's testosterone was markedly elevated, a subsequent test showed a normal level of testosterone, and tests after that one indicated low testosterone. *Id.* Plaintiff's levels of several other hormones were noted to be low as well. *Id.* Plaintiff was ultimately diagnosed with adrenal insufficiency, low adrenocorticotropic hormone,[3] and low testosterone. *Id.* at 1067. However, providers noted that Plaintiff's "diagnosis is still unclear given fluctuating hormonal patterns." *Id.* at 1058.

By the spring of 2022, Plaintiff was using a testosterone patch and reported that his symptoms had improved, although he still experienced fatigue. AR at 375. His sleep medicine provider noted "continue[d] . . . notable daytime hypersomnolence and excessive daytime sleepiness" as wall as occasionally fragmented sleep at night. *Id.* at 317. Plaintiff scored a 14 on the Epworth Sleepiness Scale despite his CPAP treatment. *Id.* at 320. A score of 10 or higher on this scale "raises concern[.]" *Epworth Sleepiness Scale*, CENTERS FOR DISEASE CONTROL, https://www.cdc.gov/niosh/work-hour-training-for-nurses/02/epworth.pdf. While a DNA test came back negative for narcolepsy, his provider felt that he should be retested in the future "as he has a lot of the clinical symptoms. It is possible that he may have idiopathic hypersomnia as well." AR at 321. At this time, Plaintiff was prescribed a higher dosage of wakefulness drugs. *Id.* at 1431.

By the fall of 2022, Plaintiff noted that his energy was improving, but stated that his "energy levels fluctuate significantly based on his hormonal levels." AR at 116. Indeed, later that

---

[3] A hormone which triggers the release of certain sex hormones. *Adrenocorticotropic Hormone (ACTH)*, CLEVELAND CLINIC (June 1, 2022), https://my.clevelandclinic.org/health/articles/23151-adrenocorticotropic-hormone-acth.

month, he continued to tell providers that "[b]y 1pm . . . he is done for the day. He needs to get any tasks done by noon, due to chronic fatigue." *Id.* at 191. Indeed, he reported that he "cannot get out of bed some days[.]" *Id.* at 883.

The exact nature of Plaintiff's hormonal condition has yet to be determined. At least one provider believed that it could be Addison's disease. AR at 1065, 1067. The symptoms of Addison's disease include extreme tiredness, sweating due to low blood sugar, diarrhea, weakness, joint pain, depression, and irritability. *Addison's Disease*, MAYO CLINIC (Dec. 1, 2024), https://www.mayoclinic.org/diseases-conditions/addisons-disease/symptoms-causes/syc-20350293. Plaintiff has frequently reported all of these symptoms. *See:*

- *supra* (Plaintiff's reports of fatigue);
- AR at 1176 (Plaintiff reported intermittent night sweats for two weeks in 2020), 1493 (Plaintiff "has little to no energy and is having spells of hotness and sweating throughout the day"), 506 (reporting night sweats), 1100 ("Intermittent night sweats—sometimes drenching" in mid-2021), 1063 (hot sweats in fall 2021), 1268 ("profuse sweating"), 1376 ("significant drenching night sweats about 2 weeks in Feb 2022", but glucose not checked), 1930 ("nauseous and sweating profusely") in September 2022 (but see *id.* at 1278 (sweating episode in late 2021 not due to low blood sugar));
- AR at 1810 (Plaintiff reports "frequent diarrhea"); 118 (Plaintiff reports "loose stool")
- AR at 1100 (Plaintiff "[e]asily tired, sometimes gets winded easily"), 1277 (Plaintiff reports weakness during sweating episodes), 1930 (Plaintiff complains of feeling "super weak"), 529 (Plaintiff mentions spells that "last[] over a week, where I just have no physical strength"), 535 (Plaintiff complains that hormone swings make him feel physically weak), 200 (Plaintiff's hand feeling weak);
- AR at 1544 (Plaintiff assessed with "[i]diopathic elbow pain" which is "unstable with unpredictable characteristics" in 2019), 1109 ("new issue of multiple joint pain" reported in early 2021), 1100 (noting "some joint aches" in Plaintiffs wrists, elbows, and occasionally shoulders since January of 2020), 1892 (Plaintiff endorses chronic pain and bone or joint problems in June 2022);
- AR at 506 (Plaintiff noted as "anxious, depressed and difficulty sleeping"), 1068 ("Body

4

feels tired and mentally depressed."), 770 (Plaintiff reports "The Depression is so bad I cant [sic] get out of bed at times"), 1914 (Plaintiff unable to leave bed due to depression), 1915 (Plaintiff contemplates suicide by overdose), 1927 (Plaintiff contemplates killing himself and his dog in response to a hurtful comment by his mother), 21 (ALJ finds Plaintiff's depression to be a "severe impairment");

- AR at 775 (Plaintiff "get[s] really irritible [sic] & angry" during periods of sleep deprivation), 1810 (Plaintiff's psychologist noting "[i]rritability [and] angry outbursts"), 207 (Plaintiff "raged at [a] guy who was harassing" Jehovah's Witnesses on a beach), 209 (Plaintiff reports "angry explosion with his wife" over her spending and jealousy), 194 (Plaintiff describes an outburst at his wedding reception after being overcharged, which included implied threats to restaurant workers, and an argument with a church elder which prompted Plaintiff to send "1000 mad texts").

Plaintiff's endocrinologist has also described Plaintiff's symptoms as consistent with secondary hypogonadism. AR at 1276. Symptoms of hypogonadism in men include decreased energy, decreased sex drive, depression, difficulty concentrating, and hot flashes. *Male Hypogonadism*, MAYO CLINIC (Sept. 29, 2021), https://www.mayoclinic.org/diseases-conditions/male-hypogonadism/symptoms-causes/syc-20354881. Plaintiff has reported all of these symptoms. *See supra*; *see also* AR at 125, 1270–71, 1375 (endocrinologist assesses Plaintiff with either no or low libido), 506 (Plaintiff reports "decreases in his concentration skills and alertness"), 22 (ALJ finds Plaintiff has a "moderate limitation" in concentrating, persisting, and maintaining pace).

Despite this evidence, the ALJ's decision did not list a hormonal condition among Plaintiff's severe impairments. AR at 21. It mentioned "concerns for elevated testosterone related to a history of steroid use" but asserted that "when the claimant ceased using steroids, his testosterone levels balanced." *Id.* In fact, although Plaintiff did use steroids at one point in his past, the record reflects that he stopped before he turned 30, well before the current medical record begins. *Id.* at 29 (Plaintiff born in 1973), 1271. While the record shows that Plaintiff received a steroid injection at an unspecified time to treat rotator cuff syndrome, there is no indication that more than one injection was given or that this was the cause of Plaintiff's high testosterone. *Id.* at

5

1075; *see id.* at 125 (endocrinologist attributing Plaintiff's high testosterone result to a "likely lab error" rather than steroids). The ALJ's decision did not address Plaintiff's testosterone *deficiency* whatsoever.

The opinion also did not directly address any sleep conditions besides sleep apnea. AR at 21. The ALJ noted that "although [Plaintiff] is noted to have a history of obstructive sleep apnea with daytime sleepiness, this readily improves with use of a CPAP machine." *Id.* at 24-25 (also asserting "no clear signs of fatigue or other impairment relating to disrupted sleep"). The opinion's only mention of narcolepsy was a passing reference describing the conditions that Plaintiff reported to his psychological evaluator. *Id.* at 26. Hypersomnia is not mentioned.

Ultimately, the ALJ concluded that Plaintiff was not disabled. AR at 31. In making this determination, the ALJ found that reports of Plaintiff's fatigue were "inconsisten[t] with the objective medical evidence and medical opinions of record" and the "otherwise limited objective results for the period at issue." *Id.* at 24, 29. The ALJ also dismissed Plaintiff's complaints of "generalized pain or body aches" due to Plaintiff's inability "to provide greater specifics regarding his physical conditions." *Id.* at 24. Finally, the ALJ rejected several expert reports which found that Plaintiff would need to take "an unreasonable number or duration of rest periods" or miss work several days per month, finding that these were unsupported by the record. *Id.* at 27.

Plaintiff appeals.

## II. Standard

The Social Security Act limits judicial review of the Commissioner's decisions to final decisions made after a hearing. 42 U.S.C. § 405(g). The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* A district court has limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1154 (quoting *Consol. Edison Co.*

1  *v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir.
2  1997). "In determining whether the Commissioner's findings are supported by substantial
3  evidence," a district court must review the administrative record as a whole, considering "both the
4  evidence that supports and the evidence that detracts from the Commissioner's conclusion."
5  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld
6  where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400
7  F.3d 676, 679 (9th Cir. 2005). However, courts "review only the reasons provided by the ALJ in
8  the disability determination and may not affirm the ALJ on a ground upon which [s]he did not
9  rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

**III.   Analysis**

It is error for an ALJ to address only some impairments while ignoring medical evidence of others. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). Similarly, it is error for an "ALJ's findings [to] completely ignore medical evidence without giving specific, legitimate reasons for doing so[.]" *Id.* This is especially true at Step 2 of the disability analysis, which is "a de minimis screening device used to dispose of groundless claims." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (internal alterations omitted). In *Webb*, the Ninth Circuit held that an ALJ erred by ignoring "evidence of problems sufficient to pass the de minimis threshold of step two." *Id.* at 687. This court finds that a similar error occurred here.

Voluminous medical evidence supports a conclusion that Plaintiff suffers from a sleep disorder besides apnea, as the record reflects consistent reports of fatigue and abnormal sleep studies even after Plaintiff's sleep apnea was being successfully managed by CPAP. The ALJ's opinion, however, mentioned only sleep apnea as a potential impairment at Step 2. Similarly, the record reflects that Plaintiff experienced low levels of testosterone and other hormones which required Plaintiff to take supplemental testosterone. Doctors believe that Plaintiff suffers from either hypogonadism or Addison's disease; indeed, Plaintiff reports other symptoms of both conditions. However, the ALJ's opinion only mentions a *high* testosterone reading, then states without evidence that Plaintiff's "testosterone levels balanced" after he stopped taking steroids. Not only does the record not indicate a causal relationship between Plaintiff's steroid use and

Plaintiff's irregular readings, it demonstrates that Plaintiff's testosterone levels were consistently and problematically *below* normal after the spike, and that other hormones were in abnormal ranges as well. Accordingly, the court concludes that the ALJ erroneously ignored evidence of certain impairments at Step 2.

Further, the court cannot conclude that this error was harmless. A Step 2 error is harmless if "the ALJ went on to address the concerns raised by [the plaintiff] at subsequent points within the five-step framework." *Brown v. Berryhill*, 2018 WL 4700348, at \*14 (N.D. Cal. Sept. 29, 2018) (citing *Lewis v. Apfel*, 498 F.3d 909, 911 (9th Cir. 2007)). However, Plaintiff's hormonal condition was not mentioned later in the ALJ's opinion. Further, the ALJ discredited some of Plaintiff's subjective symptom testimony (of fatigue, irritability, and generalized pain) which would have been consistent with symptoms of Addison's disease or hypogonadism. This testimony may well have been bolstered by a determination that Plaintiff suffered from one condition or the other. The court therefore cannot conclude that the ALJ's failure to evaluate the evidence of a hormonal condition was harmless.

The ALJ did mention fatigue at Step 4, finding "no clear signs of fatigue or other impairment *relating to disrupted sleep*" (emphasis added). However, fatigue related to another condition, such as hypersomnia, narcolepsy, or an endocrine problem, was not specifically addressed. Accordingly, the court cannot conclude that this finding accounted for all alleged fatigue symptoms, or for objective medical evidence demonstrating abnormal sleep even in the absence of apnea. And to the extent that the ALJ intended to find no clear signs of *any* fatigue resulting from *any* condition, the ALJ's citations in support of this finding do not contain substantial evidence in light of the record as a whole. See 11F/17 (AR at 1376) (endocrinologist noting Plaintiff's "activity change and fatigue" but stating that he was "alert" during the appointment); 12F/1–4 (AR at 1427–30) (documenting Plaintiff's "notable daytime hypersomnolence and excessive daytime sleepiness . . . . in spite of optimal CPAP treatment" but noting that he was "Awake/Alert" during the appointment), 18F/3 (AR at 1845) (same), 10F/1–3, 7 (AR at 1332–34, 38) (relating to Plaintiff's shoulder impairment); 15F/9 (AR at 1789) (same). The fact that Plaintiff did not actually nod off during any of three appointments, the notes from all

8

of which reflect that Plaintiff was experiencing fatigue, is not substantial evidence of no fatigue in light of the record previously summarized by this court.

The court cannot conclude that this error was harmless, either. As mentioned above, the ALJ disregarded as unsupported both Plaintiff's subjective testimony of fatigue and several expert opinions stating that Plaintiff would be required to take excessive breaks during the workday. Had the ALJ found that Plaintiff did experience serious fatigue, these credibility determinations could well have come out the other way, potentially leading to a finding of disability.

Because the ALJ's error "at Step Two indicates that the ALJ may not have accounted for all of [P]laintiff's impairments during subsequent steps of the sequential evaluation process[,]" the court "cannot resolve the additional issues raised by Plaintiff until the error in the ALJ's Step Two analysis is corrected." *Clover v. Berryhill*, 2018 WL 783809, at *6 (N.D. Cal. Feb. 7, 2018). Accordingly, this case is hereby remanded for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: March 27, 2025

ROBERT M. ILLMAN
United States Magistrate Judge